**J. Michael GEIGER, Jr., M.D., Plaintiff-Appellant,**

v.

**UNITED STATES of America, the Department of the Army, the United States of America; and Stuart, Richard B., Colonel, Defendants-Appellees.**

No. 81-3717.

United States Court of Appeals, Fifth Circuit.

June 13, 1983.

grant of the extension was entirely appropriate.

Pugh & Pugh, Robert G. Pugh, Jr., Shreveport, La., for plaintiff-appellant.

John R. Halliburton, D.H. Perkins, Jr., Asst. U.S. Attys., Shreveport, La., for defendants-appellees.

Before INGRAHAM, REAVLEY and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Michael J. Geiger, an army physician, brought this action against the United States, the Department of the Army, and Colonel Richard B. Stuart, seeking an injunction and a writ of habeas corpus releasing him from future military obligations. Pending a hearing, the district court issued a temporary restraining order barring Geiger's assignment to active duty. At the hearing, the court entertained the petition for a preliminary injunction and for a writ of habeas corpus, along with defendants' alternative motion to dismiss or for summary judgment. For reasons orally assigned, the trial judge sustained the defendants' motion and dismissed the petition. Invoking 28 U.S.C. § 2253, Geiger appeals. Concluding that the district court properly denied habeas and injunctive relief, we affirm.

### Facts

In 1969, while a freshman in medical school, Geiger was accepted into an army-funded scholarship program and commissioned a Second Lieutenant in the Army Reserve. Upon graduating from medical school in 1973, he commenced active duty with the rank of Captain and completed his year of internship at Madigan Army Medical Center, Tacoma, Washington. He then served a tour of duty as a flight surgeon. In November 1977, Geiger tendered his resignation, intending to seek a civilian residency in the field of ophthalmology. His resignation was processed and approved effective July 1, 1978.

Having learned that Geiger had been accepted into an ophthalmology residency program at the Louisiana State University Medical School at Shreveport, his superiors sought to persuade him to enter the LSU residency under the auspices of the Army Civilian Sponsored Residency Training Program. Colonel John Richards, the Army's head of graduate medical education, orally assured Geiger that he would be eligible to participate in the Continuation Pay Program (CPP),[1] a special incentive pay pro-

---

1. Prior to its amendment in 1980, 37 U.S.C. § 311 provided a special pay incentive, termed continuation pay, for military physicians and dentists who agreed to extend their terms of service on active duty. Former § 311(a) recited:

> Under regulations to be prescribed by the Secretary of Defense or by the Secretary of Health, Education, and Welfare, as appropriate, an officer of the Army or Navy in the Medical or Dental Corps, an officer of the Air Force who is designated as a medical officer or dental officer, or a medical or a dental officer of the Public Health Service who—
> (1) is serving on active duty in a critical specialty designated by the Secretary;
> (2) has completed any other definitive active duty obligation that he has under law or regulation; and

> (3) executes a written agreement to remain on active duty for at least one additional year;
> may be paid not more than four months basic pay at the rate applicable to him when he executes that agreement for each additional year that he agrees to remain on active duty. Pay under this section shall be paid in equal annual or semi-annual installments, as determined by the Secretary of Defense or the Secretary of Health, Education, and Welfare, as appropriate, in each additional year covered by an agreement to remain on active duty. Paragraph 14 of an implementing regulation promulgated by the Secretary of Defense, HQDA Message 301515C October 1974, expressly conditioned an officer's continuing entitlement to benefits under former § 311(a) upon administrative eligibility and satisfactory performance of duty. Each of the three continuation pay agreements executed by Geiger stip-

gram, during his residency. Geiger requested and received a written confirmation of Colonel Richards' assurance, which offered the following explanation of CPP:

Continuation pay is payable only during initial residency and is four months basic pay. That amount is payable annually in advance upon execution of a CPP agreement.

Shortly thereafter, and before the effective date of his separation from the army, Geiger withdrew his resignation and accepted the army's offer to fund his three-year ophthalmology residency at LSU. In return, Geiger signed an agreement binding him to serve three years' active duty after completing his residency. This agreement did not refer to continuation pay, or to any other form of remuneration. During this three-year period Geiger was to receive, and did receive, all active-duty pay and allowances commensurate with his ranks of Major and Lieutenant Colonel, including base pay, housing and subsistence allowances, and medical pay,[2] as well as full graduate tuition.

At the time Geiger entered LSUS's ophthalmology residency program, in July of 1978, he was classified as a "critical military physician" and had satisfied the remaining statutory prerequisites for an award of continuation pay. Under the terms outlined in the CPP request form

executed in June of 1978, Geiger's entitlement to continuation pay benefits was expressly conditioned upon the statute and implementing regulations, and his promise to remain on active duty for a period of one year from the effective date of said request. Once his eligibility for continuation pay was verified, final approval of his request was granted by Headquarters, Department of the Army (HQDA), effective July 1, 1978. When the one-year period expired on June 30, 1979, Geiger applied for, and was granted, a second year of continuation pay under the same terms and conditions. He elected to receive continuation pay in annual installments for the years 1978 and 1979 and was paid gross lump sums of $5,758.80 and $6,488.40, respectively, in addition to monthly payments of special medical pay during both years.

Toward the end of his second year of residency, Geiger executed yet another CPP request. Although the request was accorded preliminary approval, President Carter signed into law the Uniformed Services Health Professionals Special Pay Act of 1980, P.L. 96–284, 94 Stat. 587 (1980) (Act), before final authorization by HQDA could be given.[3] Due to this intervening change in the governing law, HQDA denied Geiger's CPP request. He was subsequently informed by letter that the newly-enacted statute entitled him to variable special pay

ulated that his request for such pay was subject to former § 311 and HQDA Message 301515C October 1974, and that he had read and understood that this regulation was incorporated by reference in his request.

2. Throughout Geiger's residency, the Army disbursed the sums of $250 per month during the first year of residency, and $350 per month thereafter, in accordance with former 37 U.S.C. §§ 302(a)(1), (b)(1) and (b)(4) (medical special pay). Geiger was promoted to Lieutenant Colonel in May of 1981.

3. Congress intended, in passing the Act, "to restructure the special pay system for physicians of the Army, Navy and Air Force, and to establish on a permanent basis the authority to provide the special pay as currently authorized for other categories of health professionals of the uniformed services." S.Rep. No. 2460, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 1722. With respect to military physicians, Section 2 of the Act completely

replaced the special pay provisions embodied in former §§ 302 (special medical pay) and 311 (continuation pay) in order to eliminate (1) the previous conditioning of payments on the obligated status of the physician; (2) expiration dates for the authority for such payments; and (3) administrative power to alter the level of payments. *Id.* at 1725. Section 4(d)(3) of the Act amended § 311 to bar Army, Navy and Air Force medical officers from participating in the CPP, which had awarded monetary benefits as an incentive for extension of active-duty service. To this end, Congress set forth four types of special pay for physicians in § 302, as amended: variable special pay (§ 302(a)(2)); a payment while not in internship or initial residency training (§ 302(a)(4)); a payment for Board certification (§ 302(a)(5)); and incentive special pay (§ 302(b)). The amendments to § 302 apply to benefits payable for perirods beginning July 1, 1981.

in the amount of $10,000 per year, to be disbursed in monthly increments of $833.33. Albeit advised in this letter that he could recoup any reduction in benefits,[4] Geiger chose, for reasons best known to himself, to make no application therefor.

At this point Geiger asked the LSU hospital administration to sponsor his last year of residency. Armed with the hospital's promise of financial support, provided he was discharged from the army, Geiger petitioned for immediate release from the army. Unsuccessful in his efforts to secure an administrative discharge, Geiger filed suit for breach of contract in the Court of Claims seeking, in the alternative, rescission of his service agreement or damages. That action is still pending.

### Standard of Review

■ The district court characterized its ruling as a dismissal based on Geiger's failure to state a claim. In so doing, the court referred to affidavits and other evidence submitted by the parties. When matters outside the pleadings are considered by the trial court, the summary judgment vehicle supplants the motion to dismiss. Fed.R. Civ.P. 12(b)(6). Thus the query posed is no longer whether the pleadings state a viable claim for relief, but whether a genuine issue of fact has been presented and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. We therefore review the district court's ruling under the standards governing a grant of summary judgment. *See Estate of Smith v. Tarrant County Hosp. Dist.,* 691 F.2d 207 (5th

Cir.1982); *United States v. East Baton Rouge Parish School Board,* 594 F.2d 56 (5th Cir.1979).

### Equitable Relief

Relying primarily on the Ninth Circuit's opinion in *Borschowa v. Claytor,* 568 F.2d 616 (9th Cir.1977), the district court ruled that the alleged breach of contract consisted solely of a refusal to award monetary benefits. The trial judge reasoned that habeas relief was unavailable in cases involving a military pay dispute, citing the *Borschowa* court's statement that the equitable remedy of rescission "is reserved for those instances where ... the breach relates to a material consideration, for example, a failure to provide specialized training, as a condition of the agreement." 568 F.2d at 617. Geiger argues that CPP benefits were a material consideration for his promise to serve three years after completing postgraduate studies, and that by withholding such benefits at the commencement of his third year of residency, the army materially breached the re-enlistment agreement. Despite the army's continued payment of special benefits during the final year of his residency under the successor legislation, Geiger contends that he incurred monetary losses, in the form of an overall diminution in pay in the amount of $1,144.40 and the value of the interest which could have been earned by the lump sum payment had it been made at the beginning of the year.

■ Like the trial judge, we decline to address Geiger's arguments that the 1978

4. Section 7 of the Act, 37 U.S.C. § 302 note, a transition and save pay provision, preserves the right of medical officers on active duty both before and after the effective day of the Act to recover any benefits lost as a result of the 1980 amendments. Section 7 of the Act provided that:

Notwithstanding any provision of the amendments made by this Act, and in accordance with regulations to be prescribed by the Secretary of Defense, any officer of the Army, Navy or Air Force who at any time before the effective date of the amendments made by this Act was entitled to special pay under section 302 of Title 37, United States Code, and any officer who after such effec-

tive date would have become entitled to special pay under such section (as in effect on the day before such effective date) had such section continued in effect, shall be paid basic pay and special pay under section 302 of such title (as in effect on and after the effective date of the amendments made by this Act) in a total amount not less than the total amount of the basic pay (as in effect on the day before such date) and special pay applicable (or which would have been applicable) to such officer under sections 302, 311, and 313 of such title (as in effect on the day before such date and computed on the rates of basic pay as in effect on the day before such date).

re-enlistment agreement implicitly provides for three years of continuation pay, or, alternatively, that his entitlement to a third year of such pay vested upon execution of the CPP request in June 1980, prior to passage of the successor legislation. Guided by the principles articulated in *United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), we hold only that the equitable relief requested is manifestly inappropriate in this case and, as to the money dispute, that Geiger has an adequate legal remedy in another forum.

■ A soldier's entitlement to pay is dependent upon statute and regulation, and not upon traditional precepts of contract law. *See United States v. Larionoff; Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1963); *Jablon v. United States,* 657 F.2d 1064 (9th Cir.1981). In *Larionoff,* the Supreme Court held that Johnson, one of seven named plaintiffs who had agreed to re-enlist in the navy while still on active duty, was entitled to payment of a "variable enlistment bonus" (VRB) upon the expiration of his original enlistment, notwithstanding Congress' intervening repeal of the authorizing statute.[5] Focusing on the point at which each serviceman elected to prolong his initial tour of duty, the Court opined that his contractual right to a VRB vested when the commitment to re-enlist was made. Johnson's pay entitlement thus could not be abrogated by legislation enacted subsequent to his execution of an extension agreement.

Regardless of whether the army had in fact promised Geiger three consecutive years of continuation pay and had reneged on that promise in the final year of residency, or whether its obligation to disburse a

third year of continuation pay had been triggered prior to the abolition of the CPP, we are convinced that Geiger received substantially all benefits bargained for and hence is not entitled to a grant of equitable relief. The army discharged its obligation to pay his educational expenses, salary and all allowances during residency, together with two years of continuation pay, followed by one year of variable special pay. Geiger elected to forego resort to the new legislation's interim "save pay" mechanism for the purpose of recovering any compensation lost under the superseding benefits program.

There has been no showing that litigation of the claim for damages now pending in the Court of Claims will not adequately reimburse Geiger for any monetary loss sustained, *see Borschowa v. Claytor,* nor has he otherwise demonstrated the exceptional circumstances necessary to justify the equitable remedy of rescission. *See United States v. Larionoff,* 533 F.2d 1167 (D.C.Cir.1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). Should a right to additional benefits ultimately be found by the Court of Claims, it can be vindicated, as was the case in *Larionoff* and *Borschowa,* through a money judgment.

We find no disputed fact material to resolution of the petition for injunctive and habeas relief. There is no basis in law or equity for relieving Geiger of the consequences of his written promise to serve three years of additional duty if the army would continue him on active duty, with all pay and allowances, and sponsor his three-year residency in ophthalmology at a civilian hospital. Because the army fulfilled its part of the bilateral agreement, Geiger must in turn perform his.

5. Although premised on the Tucker Act, 28 U.S.C. § 1346(a)(2), the amended complaint in *Larionoff* had alternatively sought judicial rescission of the plaintiffs' re-enlistment contracts. The Court of Appeals summarily rejected plaintiffs' request for equitable relief, noting, first, that the Tucker Act did not provide subject-matter jurisdiction over claims in equity and, second, regardless of the existence of equitable jurisdiction, that:

on the basis of the record before us, we would find it impossible to sustain a judicial

decree of rescission. The payment of VRBs to the plaintiffs is an adequate legal remedy, and we have been offered no evidence indicating that there are exceptional circumstances in this case that justify the grant of equitable relief.

*Larionoff v. United States,* 533 F.2d 1167, 1181 (D.C.Cir.1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). On certiorari, the Supreme Court confined its analysis to plaintiffs' collective request for a legal remedy—the payment of statutory VRBs.

The judgment of the district court is AFFIRMED.