**AUSTER OIL & GAS, INC.,**
**Plaintiff-Appellant,**

v.

**Matilda Gray STREAM, et al.,**
**Defendants-Appellees.**

No. 84–4486.

United States Court of Appeals,
Fifth Circuit.

July 1, 1985.

Stockwell, Sievert, Viccellio, Clements & Shaddock, Bernard H. McLaughlin, Jr., William E. Shaddock, William B. Monk, Charles, La., for plaintiff-appellant.

Camp, Carmouche, Barsh, Hunter, Gray & Hoffman, Geralyn P. Garvey, David R. Frohn, Scofield, Bergstedt, Gerard, Mount

& Veron, Lake Charles, La., for defend-, ants-appellees.

Before WISDOM, WILLIAMS and HILL, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The district court dismissed the complaint of appellant Auster Oil & Gas Company as to appellees Matilda Gray Stream and M.G.S. of Lake Charles, Inc., on the ground that Auster had failed to state a claim against them under 42 U.S.C. § 1983. The court also denied Auster's motion to amend its pleading to allege facts it discovered after the dismissal. We hold that Auster's original complaint stated a section 1983 claim and that the district court should have allowed the amendment. We accordingly vacate the judgment and remand the case for further proceedings.

## I. THE SOUND AND THE FURY

The events underlying Auster's claims could have arisen in Yoknapatawpha County, Mississippi,[1] but most of them happened in Calcasieu Parish, Louisiana, where Stream owned the surface and mineral rights in oil-producing property.

### A. *Lease in August*

Stream's dealings with Auster appear to have commenced in the summer of 1971, when she granted to Auster and other lessees an oil, gas, and mineral lease covering her land in the Ged Field, which lies within Calcasieu Parish. The parties filed the lease on August 10, 1971, and the Parish officially recorded it the following day. Stream retained a significant royalty interest. The lease also reserved to her the right of "access to the premises at all times for the purpose of observing all operations hereunder...." In 1979, the lessees con-tractually designated Auster as the exclusive operator of the lease, and the company began to operate and control for the benefit of all lessees a variety of oil production, transportation, and storage facilities, including wells, pipelines, and other routing equipment. A 1982 amendment to the lease increased Stream's royalty interest and gave her an option to purchase a ten percent working interest in any new wells. Stream later bought such an interest in the M–1 well, but she did not sign the 1979 operating agreement.

### B. *The Reivers*

Although her relationship with Auster apparently proceeded smoothly for several years, Stream began to suspect the company of stealing oil from the lease. In late 1982, a security agent for an oil company that owned an interest in the Ged Field heard rumors of thievery, and he initiated an investigation. The agent contacted Louisiana State Police officials, who opened a criminal investigation and assigned Trooper First Class Al Martin to determine whether grounds existed for filing criminal charges. Martin's efforts brought him into contact with Edward M. Carmouche, an attorney representing M.G.S. and Stream. Carmouche attended several meetings that law enforcement officials had called. The State Police closed their investigation in July 1983 without bringing any charges.

Carmouche's role, however, had only begun. In April 1983, Stream and M.G.S. had authorized the lawyer to investigate Auster's operations. On April 12, he wrote to Auster demanding cancellation of its leases. The letter alleged that Auster maintained "an unauthorized network of pumps, tanks and above ground and below ground pipes" and that Auster's "lack of attention to operations over an extended period of time has been of such a gross character as to have permitted the diversion of enormous quantities of oil beyond gauging equipment." Carmouche also threatened

---

1. William Faulkner imagined Yoknapatawpha County and authored several novels about it and its denizens. *See generally, e.g.,* C. Brooks, *To-ward Yoknapatawpha and Beyond* (1978); I. Howe, *William Faulkner* (1975).

legal action. Auster responded by denying the allegations and demanding that Carmouche immediately withdraw his letter or risk litigation.

## C. Intruders in the Dust

Carmouche did not stop at writing letters. He hired a private investigator, among others, to assist him in determining whether Auster had a secret pipeline network by which the company siphoned off oil. He also enlisted the aid of the State Police, and Martin rejoined the investigation. After several discussions, Carmouche, his private agents, and the State Police devised a plan for tracing the flow of oil from wells on the lease property.

The nature of the operation reflected the need to monitor the flow through segments that escaped visual observation because of their location underground. Carmouche and the others thus planned to introduce plastic capsules containing microchips into pipelines near the wells from which they carried oil and to place screens across the pipelines where they left the lease property. The movement of the oil would either lodge the microchips against the screens or carry them through other pipelines that circumvented the equipment that measured the amount of oil the lease produced. If the microchips failed to appear at the screens and the operation otherwise went well, Carmouche would have substantially confirmed Stream's suspicions of theft. Carmouche's private agents travelled to Oklahoma in the late summer of 1983 to buy the microchips, and M.G.S. supplied the funds for the purchase.

Participants in the investigation executed their plan on Sunday, September 25, 1983. The record does not clearly indicate who helped, but it does disclose that Martin observed the operation and that other State Police officers kept a lookout during the procedure. The participants disassembled well choke assemblies, shut off various valves, and broke open pipelines. Car-

mouche and the others apparently believed that the 1971 lease provision granting Stream and her representatives access at all times to the lease authorized their actions. No one had obtained a search warrant.

The tracing apparently failed. Microchips stuck in the packing in the M–1 wellhead, blocking the flow and causing the well to spew several barrels of oil onto the ground. Some of the J–8 well microchips apparently reached the screens, but Carmouche and the others failed to retrieve them. They, too, blocked the pipeline, delaying Auster's transportation and sale of the oil.

## D. Auster's Gambit

Auster soon discovered the tampering, and it demanded that Stream explain her agents' behavior and pay compensation for damage to its equipment and operations. Stream answered that she and her agents had acted lawfully. Auster then sought preliminary and permanent injunctions in Louisiana state court to bar Stream from further intrusions upon Auster's property. The state court denied the request for a preliminary injunction, but discovery and other proceedings continued. At the instance of Stream, the state court also issued a protective order limiting the scope of Auster's discovery.

Auster filed this suit on December 20, 1983. The original complaint alleged that Stream, M.G.S., and Trooper Martin had conspired to deprive Auster of property without due process of law and to conduct an unlawful search and seizure of the company's property in violation of the Fourth and Fourteenth Amendments and that they had executed that conspiracy. Auster also asserted that appellees Stream and M.G.S. had planned and performed the microchip operation in an effort to break Auster's leases.[2] Auster demanded compensatory and punitive damages.

**2.** The original complaint specifically alleged that appellees wanted to abrogate the leases to assist them "in the development and implemen-

tation of a hazardous waste storage facility in a salt dome located in the Ged Field ("Ged Dome") and located on property owned and

### E. *Go Down, Auster* or *Requiem for a Plaintiff*

Less than a month after Auster filed its complaint, Stream and M.G.S. moved for dismissal of the claims against them. On April 17, 1984, the district court granted the motion pursuant to Fed.R.Civ.P. 12(b)(6). The court held that Auster had not alleged facts sufficient to establish the "state action" that section 1983 requires. It further found that the microchip operation did not violate Auster's constitutional rights because state remedies would adequately compensate any property damage and because the 1971 lease authorized Stream and her representatives to investigate the company's operations. Auster sought interlocutory review of the dismissal, but this Court dismissed the appeal because Martin remained a defendant and the district court had not certified the case for interlocutory appeal.

On June 22, 1984, Auster petitioned the district court to reconsider its order of dismissal, to allow amendment of the complaint, or to enter final judgment as to Stream and M.G.S. under Fed.R.Civ.P. 54(b) so as to permit an interlocutory appeal. Auster claimed that it had recently discovered evidence that would cure any defects in its original complaint. The district court denied the motions to reconsider and to amend, but it did enter final judgment against Auster on its claims against Stream and M.G.S. Auster appeals the judgment and the order denying its motion to amend.

## II. STANDARD OF REVIEW: SANCTUARY

 Two principles determine the intensity of our scrutiny in this appeal. First, the Federal Rules of Civil Procedure

erect a powerful presumption against rejecting pleadings for failure to state a claim. Rule 8 fosters that policy by sweeping aside the hypertechnical pleading rules that once defeated many an unwary but meritorious claimant; it requires nothing more than a plain recitation of the facts that a party believes entitles her to relief. Thus, although Rule 12(b)(6) authorizes prompt dismissal of claims where the party's belief proves mistaken, its sanction extends only to a formal testing of the legal sufficiency of the factual basis the pleader asserts in support of her claim. In reviewing such a dismissal, we accordingly have no license to question the truth of factual allegations, *e.g., Trupiano v. Swift & Co.*, 755 F.2d 442, 443 (5th Cir.1985), and must reverse "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

 The Rules also command judicial solicitude for parties who have tried but have not completely succeeded in stating a claim. Rule 15 thus authorizes amendments that seek, among other things, to cure pleading defects.[3] The Rule nonetheless requires a finding that justice demands allowing the amendment, and our review of a denial of a motion to amend reflects recognition that making that determination rests within the sound discretion of the district court. We may overturn such a denial only when the district court abuses that discretion. *E.g., Gulf Oil Trading v. M/V Caribe Mar*, 757 F.2d 743, 751 (5th Cir.1985); *Daly v. Sprague*, 742 F.2d 896, 900 (5th Cir.1984).

## III. MICROCHIP, MICROCHIP!

 To survive a motion to dismiss, a pleading that raises a section 1983 claim

---

controlled by [appellees] in the event the Auster leases were cancelled." The record discloses that Stream and others granted to Pakhoed USA Management Co., which proposed to develop the waste storage facility, an option to lease property in the Ged Field for the three years ending December 12, 1985.

**3.** Before 1963, some federal courts refused to allow a plaintiff to cure her failure to state a claim by submitting a supplemental complaint. 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1505 (1971). An amendment to Fed.R.Civ.P. 15(d), however, authorized such additional pleading "even though the original pleading is defective in its statement of a claim for relief or defense."

must allege both that someone violated a right that the Constitution or laws of the United States secures and that the offender did so under color of state law. *E.g., Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *Roberts v. Louisiana Downs,* 742 F.2d 221, 223 (5th Cir.1984). The district court dismissed the claims against Stream and M.G.S. because it determined that Auster's original complaint failed sufficiently to allege either element. As we read the complaint, however, the allegations that appellees acted "in concert" with a State Police Trooper and that the microchip operation constituted an unlawful search and seizure sufficed to state a section 1983 claim.

## A. *Trooper's Pay*

The "under color of state law" element requires some manner of state responsibility for the acts that underlie the section 1983 claim. Nominally private conduct constitutes "state action"[4] if the connection between the state and the acts justifies treating the private actor as an agent of the state or otherwise warrants attributing her behavior to the state. *Louisiana Downs,* 742 F.2d at 224. In particular, a private party acts under color of state law if her behavior makes her a "willful participant in joint action with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970); *Phillips v. Vandygriff,* 711 F.2d 1217, 1225–26 (5th Cir.1983) (citing *Adickes*), *reh'g granted in part,* 724 F.2d 490 (5th Cir.) (per curiam), *cert. denied,* — U.S. ——, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984); *Earnest v. Lowentritt,* 690 F.2d 1198, 1200 (5th Cir.1982) (quoting *Adickes*). We believe that the original complaint alleged facts that would at a minimum support a finding that Stream and M.G.S. acted under color of state law.

The complaint contains, in fact, abundant allegations of appellees' willful participation with a state agent in action that Auster claims violated its constitutional rights. The company asserted that appellees' agents and Trooper Martin "acted illegally and in concert to introduce plastic capsules containing microchips into oil and gas wells." The original complaint elaborated:

In the late afternoon of Sunday, September 25, 1983, State Trooper Al Martin, acting in his official capacity and employed by the State of Louisiana, Department of Public Safety, Office of State Police, Rick Lucas and Mike Veasey, in their capacities as employees, agents, and representatives of Matilda Gray Stream and M.G.S. Lake Charles, Inc., and another individual whose last [sic] name is believed to be Irvin Quibodeaux, drove from Lake Charles to Vinton, Louisiana, and entered upon the Auster premises and illegally placed plastic capsules containing microchips in the M–1 Well and the J–8 Well and at other undisclosed locations on the Auster Oil and Gas, Inc. lease premises.

Auster further alleged that appellees' agents carried out the operation while "acting in joint action and concert with State Police Detective Al Martin", that the agents and State Police jointly planned the operation, that Martin and the agents "collectively possessed and shared information concerning the covert operations", and that they "collectively controlled, directed and supervised operations designed to plant the plastic packages in Auster's well and to retrieve same." Much of the remainder of the original complaint simply repeated and embellished the basic allegation of joint action between a state agent and private individuals. Thus, we must say that Auster, in support of its claim of state action on the part of appellees, might be able to prove a set of facts that would entitle it to relief.

---

**4.** While "state action" and "under color of state law" represent theoretically distinct ideas, "the two concepts are treated as co-extensive for purposes of determining jurisdiction under § 1983," *Roberts v. La. Downs,* 742 F.2d 221, 223 n. 2 (5th Cir.1984), and we use the phrases interchangeably in this opinion.

The district court nonetheless construed the complaint to allege only that appellees induced but did not themselves engage in action under color of state law. In so holding, the court relied on decisions establishing that a private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority.[5] None of those cases conflicts with our holding here for each involved circumstances in which a private individual did no more than prompt agents of the state to use the power the state gave them. In this case, Auster alleged that appellees did far more than request official intervention and then await the result from the sidelines. The complaint asserted, on the contrary, that appellees not only prompted the State Police to action but jointly planned and jointly executed the microchip operation with Trooper Martin under color of his official authority. We thus hold that the original complaint alleged action under color of state law sufficient to survive a motion to dismiss.

## B. *As the Wells Lay Pumping*

Auster's original complaint alleged that the microchip operation deprived it of property without due process of law and violated its "constitutional rights in privacy and to be free from unlawful searches and seizures." The district court found the allegations deficient in two respects. It first determined that the lease agreement entitled appellees "to be present on the leased premises" and thus to conduct the microchip operation. "Given this right", the court reasoned, "there could be no depriva-

tion of Auster's right to privacy, even if such right is cognizable in this court." The court then concluded that the existence of an adequate state remedy for the property damage of which Auster complained "foreclosed the plaintiff's § 1983 complaint of deprivation of property without due process of law."[6] We hold that the complaint sufficiently alleged an unreasonable search and an unreasonable seizure.

The Fourth Amendment prohibits only those unreasonable searches and seizures that the government or its agents execute. The amendment condemns a search or seizure as unreasonable unless "the community's need for evidence surmounts a specified standard, ordinarily 'probable cause.'" *Winston v. Lee,* — U.S. —, —, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985). Indeed, carrying out a search and seizure without a prior judicial determination of probable cause requires a presumption of unreasonableness. *See, e.g., United States v. Karo,* — U.S. —, —, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984) ("Warrantless searches are presumptively unreasonable...."); *United States v. Jacobsen,* — U.S. —, —, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Not all government intrusions, even unreasonable ones, however, trigger Fourth Amendment protections; they must constitute a "search" or a "seizure". As the Supreme Court has defined those terms:

A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "sei-

---

**5.** The court cited *Hernandez v. Schwegmann Bros. Giant Supermarkets,* 673 F.2d 771 (5th Cir.1982) (per curiam) (affirming directed verdict on ground of no action under color of state law where evidence showed only that private merchant detained person he suspected of shoplifting pending arrival of police); *Tarkowski v. Robert Bartlett Realty,* 644 F.2d 1204 (7th Cir. 1980) (upholding dismissal of complaint alleging that private party induced state officials to discriminate in enforcing zoning ordinances); *White v. Scrivner Corp.,* 594 F.2d 140 (5th Cir. 1979) (affirming judgment after bench trial where evidence did not show joint action between police and private merchant in latter's

detention and search of potential shoplifter); and *Grow v. Fisher,* 523 F.2d 875 (7th Cir.1975) (upholding dismissal of complaint because private parties' inducing state officials to bring criminal charges did not amount to action under color of state law).

**6.** The district court based this part of its holding on decisions that applied *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), where the Court held that state remedies for damage to property satisfy the requirements of due process. We pretermit the question of the court's dismissal of Auster's due process claim.

zure" of property occurs when there is some meaningful interference with an individual's possessory interest in that property.

*Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1656; *Karo,* —— U.S. at ——, 104 S.Ct. at 3302 (quoting *Jacobsen* ). With these principles in mind, we do not hesitate in holding that the original complaint stated claims under the Fourth Amendment.

■ Auster alleged facts supporting the conclusion that the microchip operation entailed "meaningful interference with" the company's possessory interests in property and thus constituted a "seizure" of that property. Auster claimed an exclusive right under the operating agreement to operate the production facilities, including the wells, pipelines, and their appurtenances.[7] An exclusive right to operate necessarily implies an exclusive right to possess; one cannot operate oil and gas production facilities without possessing them. The complaint also amply alleged that appellees significantly intruded upon Auster's possessory interests. It stated that appellees disassembled pipelines, placed screens in them, turned valves to halt the flow of oil, and took apart the choke assemblies of the M–1 and J–8 wells. Appellees thus exercised "dominion and control ... for their own purposes" over property in which Auster enjoyed a possessory interest, and their behavior thus "clearly constituted a 'seizure'" under Auster's allegations. *Jacobsen,* —— U.S. at —— n. 18, 104 S.Ct. at 1660 n. 18.

■ Auster also sufficiently alleged a search. Auster had a legal right to control the course over which it routed the transmission of oil and gas as part of its operational rights and responsibilities. Appellees point us to no law that compelled Auster to direct the flow over a particular route or one that made deviation from such a route illegal and, hence, illegitimate for purposes of the Fourth Amendment. *See Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1662 (holding that illegality of cocaine possession rendered illegitimate any expectation that nature of substance would remain private after government lawfully obtained it). Thus, although Auster's property rights do not control the inquiry,[8] we cannot say in the absence of evidence that the company harbored no legitimate, reasonable expectation that the route it had chosen would remain private. We do not doubt, moreover, that the microchip operation infringed Auster's arguable expectation of privacy; the defendants planned and executed the operation solely to trace the course of the oil flow and thus to determine whether Auster had diverted production from metering equipment. Such monitoring, when it infringes a legitimate expectation of privacy, constitutes a search. *See Karo,* —— U.S. at ——, 104 S.Ct. at 3304 (finding an unreasonable search in government's warrantless monitoring of beeper inside package to interior of house). Accepting Auster's allegations as true, we read the original complaint as sufficiently asserting that appellees searched Auster's production facilities.

■ Nor do we find deficient Auster's allegations regarding the reasonableness of appellees' alleged invasion of the

**7.** Stream contends that the Louisiana Mineral Code rather than the operating agreement governed her right to conduct "operations" on the lease property and that the Code gave her authority to execute the microchip operation. She grounds the argument on the allegation that she did not sign the operating agreement and on the conclusion that the agreement thus did not bind her. We neither address nor decide the question because, as we have noted, we must accept as true Auster's allegation that it enjoyed the exclusive right to operate the lease and its facilities. In any event, the record at least suggests that Stream acquiesced in Auster's role as exclusive operator in that she apparently did not object to the company's performing that func-

tion over a period of some years. The operating agreement thus may bind her despite her failure to execute it. We reject her argument that the Mineral Code authorized the microchip operation, *infra.*

**8.** *See, e.g., Oliver v. United States,* —— U.S. ——, ——, 104 S.Ct. 1735, 1744, 80 L.Ed.2d 214 (1984) (" '[E]ven a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon.' ") (quoting *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978)).

company's property and privacy interests. As we have said, that appellees proceeded without a warrant compels a presumption of unreasonableness. The presumption alone discharges Auster's burden of pleading the unreasonableness of the alleged search and seizure. In any event, Auster's factual allegations established its right to undertake to produce evidence at trial demonstrating unreasonableness. Assessment of the reasonableness of conduct involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1662–63 (quoting *Place* ). In this case, Auster alleged that the microchip operation entailed extensive tampering with production facilities. We may reasonably infer that the operation lasted a significant period of time, *see Place,* 462 U.S. at 707, 103 S.Ct. at 2645 (holding seizure unreasonable due to length of detention of property), that damage to production facilities permanently deprived Auster of property, *cf. Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1662 (noting greater intrusiveness upon Fourth Amendment interests where post-seizure field test of cocaine "converted ... a temporary deprivation of possessory interests into a permanent one"), and that the use of the microchips in the wells and pipelines impinged significantly upon the integrity and functioning of the production facilities. The original complaint thus alleged more than that "the infringement

was *de minimis* and constitutionally reasonable." *Id.* at ——, 104 S.Ct. at 1663. It stated a claim of unreasonable search and unreasonable seizure.

■■■ Appellees nonetheless assert that Auster could not have reasonably expected privacy because their lease agreement with Auster as well as the Louisiana Mineral Code authorized them to conduct the microchip operation. We believe neither the contract nor the Code reached so far. The lease provided that Stream or her "representatives shall have access at all times to the premises for the purpose of observing all operations hereunder...." We read the provision to authorize just what it purports to authorize—"observation" of operations. We do not interpret it, contrary to appellees' contentions, to entitle appellees surreptitiously to intrude physically upon those operations by dismantling choke assemblies and pipelines, shutting off the flow of oil, injecting foreign objects into the production equipment, and damaging the facilities and possibly the substrata. Certainly the lease allowed appellees to enter upon the premises and to look around, but it did not confer *carte blanche* to interfere with Auster's operations. The lease simply did not negate Auster's expectation of privacy or its possessory interest in the production facilities.[9]

■■■ The Louisiana Mineral Code warrants a like conclusion. Appellees rely on a provision that restricts the ability of mineral lease co-owners to operate production facilities on the lease. The statute provided in relevant part:

9. We note *sua sponte* that the district court's receipt of and reliance upon material outside the complaint meant that it should have converted the Rule 12(b)(6) motion for dismissal into a Rule 56 motion for summary judgment and observed the procedural requirements that Rules 12(b) and 56 prescribe. *See* Fed.R.Civ.P. 12(b) (last sentence), 56(c). The court's failure to do either raises two distinct issues. The first concerns the notice and hearing requirements of Rule 12(b) and Rule 56. Although the record does not indicate that the court gave the parties notice of its intention to consider matter outside the complaint and to render judgment on the merits, the parties "neither objected below nor raised before us the spectre of an inadequate hearing." *Batiste v. Burke,* 746 F.2d 257, 259 n.

2 (5th Cir.1984). They have thus waived any objection to the court's manner of proceeding. *Id.* The second question involves our standard of review. Where "a district judge grants a motion styled a motion to dismiss, but bases his ruling on facts developed outside the pleadings, ... the appellate court will review the order under the standards laid down in Fed.R.Civ.P. 56." *Estate of Smith v. Tarrant County Hosp. Dist.,* 691 F.2d 207, 208 (5th Cir.1982) (footnote omitted); *see Geiger v. United States,* 707 F.2d 157, 160 (5th Cir.1983) (citing *Estate of Smith* ). We need not scrutinize afresh the record in this case to conclude that appellees have not satisfied that standard. As our discussion of the issues shows, ample questions of material fact remain for trial.

A co-owner of the lessee's interest in a mineral lease may not independently conduct operations or, except as provided in this article and Article 171, deal with the interest without the consent of his co-owner. *He may act to prevent waste, destruction, or termination of the lease and to protect the interest of all, but cannot impose upon his co-owner liability for any costs or expenses except out of production.*

La.Rev.Stat.Ann. § 31:177 (West 1975) (emphasis supplied). We see nothing in the statute authorizing appellees to interfere physically with the facilities Auster used to produce oil and gas. On the contrary, the language sanctioning actions to prevent waste merely qualified the general prohibition, in the preceding sentence, against a co-owner's independently conducting operations without the other co-owners' consent. Acting "to prevent waste" thus involves conducting independent operations regardless of co-owners' permission with a view to avoiding unnecessary loss of oil or gas, as where a co-owner takes it upon herself to drill a well to protect against drainage by an adjoining landowner. The statute did not authorize appellees to interfere with Auster's operations, but rather to conduct their own if necessary "to prevent waste". It thus did not negate Auster's possessory interest or expectation of privacy in the production facilities. *Cf. Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 257 (5th Cir.) (finding that lease owners consented to search of oil lease by accepting lease subject to state statutes authorizing state officials to enter and search mineral leases), *modified on reh'g*, 744 F.2d 1131 (5th Cir.1984).

## IV. THE UNVANQUISHED

Two months after the district court dismissed its claims against appellees, Auster sought to cure the deficiencies the court had found in its allegations of state action and constitutional deprivation. The amended complaint Auster offered expressly asserted that the defendants had lacked probable cause to search and seize. It also added allegations that appellees' agents had principally controlled and physically executed the microchip operation, that State Police troopers had patrolled the perimeter of the lease property to maintain a lookout during the operation, and that Trooper Martin documented the insertion and monitoring of the microchips. The new allegations, Auster argued, repaired any shortcomings in its original complaint. The district court nonetheless denied the motion to amend without opinion.

As we have indicated, Rule 15(a) requires the district court to allow amendments "freely ... when justice so requires", and we may overturn its denial of a motion to amend where it has abused its discretion in fathoming the dictates of justice. We find such an abuse here. Auster sought the amendment just six months after it filed this action, it had diligently sought discovery in both state court and these proceedings, and it asked for amendment promptly upon discovering the basis for new allegations. Appellees thus cannot claim prejudice due to untimeliness of Auster's motion or any delay it might cause. *See, e.g., Harvey v. Andrist*, 754 F.2d 569, 571 n. 1 (5th Cir.1985) (upholding refusal to allow amendment where motion filed ten weeks before trial); *Earlie v. Jacobs*, 745 F.2d 342, 345 (5th Cir.1984) ("[T]he court may consider whether the amendment would cause undue delay in the proceedings [or] undue prejudice to the non-movant...."); *Daly v. Sprague*, 742 F.2d 896, 900 n. 6 (5th Cir.1984) (noting relevance of "timeliness of the amendment with regard to the progress of the case as a whole"). Nor does the record support a finding that Auster requested the amendment to achieve a tactical advantage or otherwise in bad faith. *See Earlie*, 745 F:2d at 345; *Engel v. Teleprompter*, 732 F.2d 1238, 1242 (5th Cir.1984) ("Leave to amend may be denied if a likelihood of prejudice or some other procedural abuse is shown."). That Auster endeavored chiefly to correct any flaws in its original statement of its claims and did not seek to allege new causes of action also cuts in favor of holding that justice requires allowing the amendment. *See Daly*, 742 F.2d at 900 n. 6 (stating that appropriateness of amendment depends in part on "the germaneness

of the subject matter of the amendment to the subject matter of the suit"). We now so hold; the district court should have allowed the amendment.

We recognize that the amendment will not affect the adequacy of the original complaint, which we have upheld as sufficient in itself. The new allegations will nonetheless more precisely define the factual basis that Auster asserts in support of its claims. Especially since appellees have yet to file answers, it will thus serve the salutary purpose of narrowing the focus in dispute.

## V. THE END

The original complaint stated claims under the Fourth Amendment, and Auster presented more than adequate grounds for securing leave to amend that complaint. We accordingly vacate the district court's judgment against Auster and remand the case with instructions to allow Auster to amend its complaint.

VACATED AND REMANDED WITH INSTRUCTIONS.