**STEWART GLASS & MIRROR, INC., et al., Plaintiffs,**

v.

**U.S.A. GLAS, INC., et al., Defendants.**

No. 1:95–CV–813.

United States District Court,
E.D. Texas,
Beaumont Division.

Sept. 16, 1996.

Columbus, OH, Julie E. Hawkins, Lee H. Simowitz, Gerald A. Connell, Baker & Hostetler, Washington, DC, for Safelite Glass Corp.

Walter Joshua Crawford, Jr., Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, TX, Christopher K. Larus, John A. Cotter, Larkin Hoffman Daly & Lindgren Ltd., Bloomington, MN, for Harmon Glass Co., Inc.

David J. Beck, Lonny J. Hoffman, L. Nicole Batey, Beck Redden & Secrest, Houston, TX, Thomas A. Doyle, Donald J. Hayden, Baker & McKenzie, Chicago, IL, for Windshields America, Inc.

Jack Nolan Price, Law Office of Jack N. Price, Austin, TX, J. Thad Heartfield, Jr., Heartfield & McGinnis, Beaumont, TX, David Cohen, Law Office of David Cohen, Austin, TX, for Stewart Glass & Mirror, Inc., Texas Mobil Auto Glass Inc., RLJ Inc., dba A–1 Glass Co., Freddy's Auto Glass & Mirror Inc., Nederland Glass Co. Inc., Lone Star Glass Inc., Auto Glass Specialists Inc., Allied San Jacinto Glass Co.

J. Michael Baldwin, David G. Patent, Baker & Botts, Houston, TX, Robert K. Niewijk, Joel G. Chefitz, Katten Muchin & Zavis, Chicago, IL, for U.S. Auto Glass Discount Centers Inc., U.S.A. Glas, Inc.

David W. Ledyard, Strong Pipkin Nelson & Bissell, Beaumont, TX, Paul Sanders Francis, Baker & Hostetler, Houston, TX, Robert M. Kincaid, Jr., Baker & Hostetler,

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

SCHELL, Chief Judge.

Before the court are Defendants' motions to dismiss Plaintiffs' Second Amended Complaint. Plaintiffs filed a collective response. Thereafter, two Defendants filed replies, and Plaintiffs again filed a response. Upon consideration of the motions, responses, replies, and memoranda of law, this court is of the opinion that Defendants' motions to dismiss should be granted in part and denied in part.

## I. BACKGROUND

Plaintiffs have sued Defendants for violations of Sections 1 and 2 of the Sherman Act, tortious interference with existing and prospective contracts, and violation of the Texas Insurance Code, Art. 5.07–1. Plaintiffs and Defendants are competitors in the business of repair and replacement of auto glass, and residential and commercial flat glass. Plaintiffs are eight Texas corporations (hereinafter referred to collectively as "Plaintiffs"). Defendants are four foreign corporations doing business in Texas: U.S.A. Glas, Inc. ("U.S.A. Glas"), Safelite Glass Corp. ("Safelite"), Harmon Glass Company, Inc. ("Harmon"), and Windshields America, Inc. ("Windshields America").

In their Second Amended Complaint, Plaintiffs allege that Defendants conspired with various insurance companies to dominate and control the business of replacement and repair of auto glass and flat glass underwritten by insurance companies in Texas. Pls.' Second Am.Compl. ¶ 7. Plaintiffs allege that Defendants cooperated with one another on many aspects of their business. For the sake of brevity, the court will mention only a few examples. First, Defendants allegedly agreed among themselves to divide and allocate customers and territories. *Id.* ¶¶ 8, 9(a)–(b). Second, Defendants allegedly exchanged information on many aspects of business operations such as claims, pricing, and costs. *Id.* ¶¶ 9(c)–(f). Third, Plaintiffs claim that Defendants cooperated in marketing through utilizing computerized-rotating telephone systems and sharing customer service representatives. *Id.* ¶¶ 9(g)–(1). And fourth, Defendants allegedly agreed to refer business to non-Defendant glass shops only on certain conditions. *Id.* ¶ 10.

Plaintiffs further allege that Defendants control (1) over fifty percent of the auto glass repair and replacement business underwritten by insurance companies in Texas and (2) over fifty percent of the residential and commercial flat glass repair and replacement business underwritten by insurance companies in Texas. *Id.* ¶ 11. Plaintiffs allege that this conspiracy by Defendants and unnamed insurance companies has reduced competition and injured Plaintiffs in the form of lost profits. *Id.* ¶¶ 12, 22. Plaintiffs define the relevant market as the business of repair and replacement of (1) auto glass underwritten by insurance companies in Texas and (2) residential and commercial flat glass underwritten by insurance companies in Texas. *Id.* ¶ 13.

Plaintiffs allege seven causes of action. In their first cause of action, Plaintiffs allege that Defendants violated Section 1 of the Sherman Act by entering into agreements that unreasonably restrained trade. *Id.* ¶ 14. In their second cause of action, Plaintiffs allege that Defendants violated Section 2 of the Sherman Act by monopolizing, attempting to monopolize, and conspiring to monopolize the glass repair and replacement market through willfully acquired monopoly power. *Id.* ¶ 15. In their third cause of action, Plaintiffs allege that Defendants divided and allocated customers in violation of Section 1 of the Sherman Act. *Id.* ¶ 16. In their fourth cause of action, Plaintiffs allege that Defendants unlawfully boycotted Plaintiffs by denying them referrals from insurance companies. *Id.* ¶ 17. In their fifth cause of action, Plaintiffs allege that Defendants fixed prices. *Id.* ¶ 18. In their sixth cause of action, Plaintiffs allege that Defendants tortiously interfered with Plaintiffs' existing and prospective contracts. *Id.* ¶ 19. In their seventh cause of action, Plaintiffs allege that Defendants violated Article 5.07–1 of the Texas Insurance Code, which prohibits an insurer from limiting its coverage under a policy covering damage to a motor vehicle by limiting the beneficiary of the policy from selecting a person or shop to repair damage to the motor vehicle covered under the policy. *Id.* ¶ 20.

## II. APPLICABLE STANDARDS FOR RULE 12(b)(6)

Rule 12(b)(6) provides that a party may move a court to dismiss an action for "failure to state a claim upon which relief can be granted." On motion under Rule 12(b)(6), the court must decide whether the facts alleged, if true, would entitle the plaintiff to some legal remedy. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Dismissal is proper only if there is either (1) "the lack of a cognizable legal theory" or (2) "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). Unless a Rule 12(b)(6) motion is converted to a summary judgment motion, the court cannot consider material outside the complaint. *See Powe v. Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The court must accept as true all material allegations in the complaint as well as any reasonable inferences to be drawn from them. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The well-pleaded facts must be reviewed in the light most favorable to the plaintiff. *Piotrowski v. City of Houston,* 51

F.3d 512, 514 (5th Cir.1995). A plaintiff, however, must allege specific facts, not conclusory allegations. *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989). Conclusory allegations and unwarranted deductions of fact are not admitted as true. *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992). A pleading, however, "need not specify in exact detail every possible theory of recovery—it must only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Thrift v. Hubbard,* 44 F.3d 348, 356 (5th Cir.1995) (quoting *Conley,* 355 U.S. at 47, 78 S.Ct. at 102–03). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 102; *Kaiser Aluminum,* 677 F.2d at 1050. "'The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Id.* at 1050 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (1969)).

"[Rule 12(b)(6) ] must be read in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim in federal court and calls for 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" WRIGHT & MILLER, *supra,* § 1356; *see also Thrift,* 44 F.3d at 356 n. 13. "[T]he Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381, 386 (5th Cir.1985). "Rule 8 fosters that policy by sweeping aside the hypertechnical pleading rules that once defeated many an unwary but meritorious claimant." *Id.* "A plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests." *Colle v. Brazos County,* 981 F.2d 237, 243 (5th Cir.1993). "Rule 8 indicates that a complaint need only set out a generalized statement of facts from which defendant will be able to frame a responsive pleading." WRIGHT & MILLER, *supra,* § 1357.

## III. DISCUSSION

The issue for determination is whether Plaintiffs have alleged sufficient facts for their antitrust and state law theories of recovery. Defendants collectively make a number of arguments that Plaintiffs have failed to state a claim upon which relief can be granted. First, Defendants argue that Plaintiffs lack standing to bring this antitrust action because their complaint fails to allege that they suffered "antitrust injury" from Defendants' acts. Second, Defendants argue that Plaintiffs have not alleged facts showing that any Defendant possesses or has a dangerous probability of acquiring market power. Third, with respect to Plaintiffs' tortious interference claims, Defendants argue (1) that Plaintiffs have not alleged any specific contracts into which they were likely to have entered and (2) that the "interference" of which Plaintiffs complain is merely the privileged business-generation of their competitors. Fourth, with respect to Plaintiffs' claim under the Texas Insurance Code, Defendants argue (1) that the Code applies only to insurers rather than competing glass providers such as Defendants and (2) that the Code does not allow for a private right of action.

### A. *Section 1 of the Sherman Act*

1. Section 1 Conspiracy Standards Relating to Preferred Provider Agreements

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. "The elements required to state a Section 1 claim are: (1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an unreasonable restraint of trade." *Ancar v. Sara Plasma, Inc.,* 964 F.2d 465, 469 (5th Cir.1992). "To satisfy the first element, pleadings must contain charges of the defendants' conspiracy and factual allegations that would support such a claim." *Id.* To satisfy the second element, an "interstate impact need not be intentional but, rather, may be indirect or fortuitous." *Id.* An illegal restraint of trade that has a

market wide effect on the output or price of goods or services is sufficient to affect interstate commerce. *See Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 331–32, 111 S.Ct. 1842, 1847–48, 114 L.Ed.2d 366 (1991). With respect to the third element, "[a]though most restraints are analyzed pursuant to a 'rule of reason,' some trade agreements are so egregiously anti-competitive that they are conclusively presumed illegal without further examination." *Ancar,* 964 F.2d at 470. Accordingly, the nature of the alleged agreements between and among the Defendants will determine whether to apply rule of reason or *per se* scrutiny.

Defendants characterize the agreements between themselves and insurance companies as preferred provider agreements. Mem. in Supp. of Windshields America's Mot. to Dismiss at 2–4. Defendants correctly state that many preferred provider agreements have withstood antitrust scrutiny. A leading case is *Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). In this case, Quality Auto Body ("Quality") brought a Section 1 action against two insurance companies that provided coverage for auto repair work. *Id.* at 1197. Quality alleged that the insurance companies violated Section 1 "by processing damage claims in a manner which fixes the price Quality can charge for automobile repairs and by boycotting Quality if it fails to adhere to the defendants' price." *Id.* Under the policies issued by the insurance companies, insureds who needed automobile repair could select their own body shop or go to a shop selected by the insurance companies. *Id.* at 1197–98. Regardless of the insured's choice, the insurance companies would pay only the amount that they determined to be reasonable for the repairs. This determination was based on market surveys of the prevailing competitive rates. *Id.* If an insured used a shop that charged higher than the predetermined competitive rates, the insured would have to pay the difference from his or her own pocket. *Id.*

Quality was one of the few shops that refused to lower its repair rates to the "competitive rates" as determined by the insur-

ance companies. *Quality Auto Body,* 660 F.2d at 1198. In its Section 1 action against the insurance companies, Quality argued that the insurance companies fixed prices by refusing to pay more than what they determined to be the prevailing competitive rates. *Id.* at 1199. Quality also argued that the defendants' practices amounted to a boycott in violation of Section 1. *Id.* The Seventh Circuit explained Quality's boycott contention:

> Quality contends that the defendants maintain lists of body repair shops which agree to charge the rates established by the defendants and direct insureds to these preferred shops for automobile repairs. According to Quality, these vertical agreements not only reinforce defendants' price structure but also effectively withhold business from shops which do not participate in defendants' pricing program. Quality claims that defendants' action amounts to a boycott of non-conforming shops....

*Id.* at 1199.

The district court had granted summary judgment in favor of the defendant insurers. *Quality Auto Body,* 660 F.2d at 1197. For purposes of the cross-motions for summary judgment, the district court assumed that the defendants had entered into preferred provider agreements with automobile repair shops regarding the price of repair. *Id.* at 1199. "But after analyzing these agreements under the rule of reason, the [district] court determined, as a matter of law, that such provider agreements do not, in and of themselves, violate the Sherman Act." *Id.* "[T]he [district] court [also] found no factual basis to support a holding that defendants engaged in an illegal boycott of plaintiff's business." *Id.*

The Seventh Circuit affirmed the district court's decision. The Seventh Circuit scrutinized the agreements under the rule-of-reason analysis noting that "no court which has examined the antitrust implications of insurance provider agreements has used a *per se* approach." *Quality Auto Body,* 660 F.2d at 1203. The court observed: "The vertical agreements, to the extent they exist here, are between buyers (the insurance compa-

nies) with apparently extensive market power and sellers (the body shops) with what, in comparison, seems slight market power." *Id.* The court assumed that the defendants had entered into preferred provider agreements with automobile repair shops. Under the terms of these agreements, if a shop performs work at the "competitive rates" as determined by the insurance companies, the shop would be "placed on a 'preferred' list and receive a steady stream of referrals from claim adjusters." *Id.*

The court determined that under certain circumstances these preferred provider agreements were legal under Section 1. The court held:

> A contract of this nature between a buyer (the insurance company) and a seller (the body shop) generally does not, without more, appear to violate the antitrust laws at all. Only if such an agreement contains restrictions on one party's activities *other than those involved in the immediate purchase and sale* does the possibility of a Sherman Act violation arise.

*Quality Auto Body,* 660 F.2d at 1203 (italics in original). The court's rationale was that preferred provider agreements have procompetitive effects that inure to the benefit of consumers:

> In refusing to pay a price higher than what they regard as the competitive rate, defendants [insurance companies] have not imposed any restriction on the repair shops beyond the immediate sales transaction. Defendants are simply taking steps to insure the best terms available in the marketplace and firmly indicating their position on price to the seller (the body shops). As the Third Circuit explained in *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973) ... "this pressure encourages [suppliers] to keep their costs down; and, for its own competitive advantage, [enables the insurer to pass] ... along the savings thus realized to consumers. To be sure, [the insurer's] initiative makes life harder for commercial competitors.... The antitrust laws, however, protect competition, not competitors; and

stiff competition is encouraged, not condemned." *Id.* at 84. Thus, the mere existence of informal (or formal) provider agreements in the instant case, far from establishing a Sherman Act violation, seems merely to show aggressive and competitive dealing by the insurance companies.

\* \* \* \* \* \*

> [T]hese defendants [insurance companies] have an undeniable impact on the price structure of the auto repair market. But much as this impact may contribute to the discomfiture of the body shops, it probably rebounds to the benefit of competition and consumers. In the absence of proof of some concerted action or an abuse of defendants' buying power, the provider agreements do not illegally restrain trade.

*Quality Auto Body,* 660 F.2d at 1203–204.

The Seventh Circuit also affirmed the district court's decision to grant summary judgment in favor of the insurance companies on the issue of boycotts. "Quality contend[ed] that defendants' claims practices prevent[ed] plaintiff's shop from effectively competing with other repair shops which are willing to perform work at the prevailing competitive rate and therefore amount to a boycott of plaintiff's business." *Id.* at 1206. The court found no evidence amounting to a concerted refusal to deal. *Id.* The court stated: "The uncontroverted facts establish that neither Allstate nor State Farm has ever refused to deal with Quality. On the contrary, a large portion of Quality's business is generated by defendants' policyholders and claimants." *Id.*

Courts also have determined that preferred provider agreements in the medical care industry are legal under the antitrust laws and may have pro-competitive effects. *See, e.g., Royal Drug Co. v. Group Life and Health Ins. Co.,* 737 F.2d 1433, 1438–39 (5th Cir.1984) (pharmacy agreement), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); *Barry v. Blue Cross of California,* 805 F.2d 866, 871 (9th Cir.1986) (physician agreement); *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922, 933 (1st Cir.1984) (physician agreement),

*cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502, 506 (2d Cir.1982) (pharmacy agreement); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230, 237 (N.D.Cal.1981) (pharmacy agreement), *aff'd,* 677 F.2d 47 (9th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982).

■ A preferred provider agreement, however, may violate the antitrust laws if "such an agreement contains restrictions on one party's activities other than those involved in the immediate purchase and sale." *Quality Auto Body,* 660 F.2d at 1203 (italics omitted). A preferred provider agreement may illegally restrain trade if the parties to the agreement engage in some concerted action or the purchaser abuses its buying power. *Id.* at 1204. An illegal type of concerted action could be a boycott by the insurance companies in which they conspire with repair shops to refuse to deal with other competing repair shops. *See id.* at 1206.

### 2. Sufficiency of Facts Alleged for Section 1 Violation

■ In their Second Amended Complaint, Plaintiffs allege that Defendants entered into agreements with insurance companies "to dominate and control the business of replacement and repair of auto glass and flat glass underwritten by the insurance companies in the State of Texas." Pls.' Second Am.Compl. ¶¶ 2(e), 7. Plaintiffs also allege that Defendants worked together to sell glass replacement services to insurance companies. *Id.* ¶ 9(i). Plaintiffs further allege that, in combination and conspiracy, Defendants denied Plaintiffs access to glass repair and replacement business except on particular terms dictated by Defendants. *Id.* ¶¶ 10, 17.

The court determines that Plaintiffs allege sufficient facts under Section 1 of the Sherman Act to survive a Rule 12(b)(6) motion. Plaintiffs allege that Defendants and insurance companies entered into agreements. With respect to the affecting-interstate-commerce element, Plaintiffs allege that Defendants' agreements have affected competition on a market wide basis in Texas. Pls.' Second Am.Compl. ¶ 12. Plaintiffs also allege that Defendants' agreements impose an unreasonable restraint of trade. Preferred provider agreements between various Defendants and insurance companies may be legal if those agreements are limited to the immediate sales transaction. *Quality Auto Body,* 660 F.2d at 1203. Plaintiffs, however, allege that Defendants entered into agreements with insurance companies to boycott Plaintiffs. Pls.' Second Am.Compl. ¶¶ 2(e), 7, 10, 17. Although Plaintiffs do not explain in detail the precise nature of Defendants' agreements among themselves and with insurance companies, a complaint ordinarily needs to be only a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests. *See* FED.R.CIV.P. 8(a); *Colle,* 981 F.2d at 243.

■ A boycott is a restraint of trade within the meaning of Section 1 of the Sherman Act. *F.T.C. v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 422, 110 S.Ct. 768, 774, 107 L.Ed.2d 851 (1990). "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). Boycott violations "have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (internal quotations and citations omitted). Plaintiffs sufficiently allege that Defendants, in conspiracy with insurance companies, have entered into agreements to boycott or refuse to deal with Plaintiffs. Pls.' Second Am.Compl. ¶¶ 2(e), 7, 10, 17.

Defendant U.S.A. Glas argues that "[n]othing in the antitrust laws requires a defendant to give to a third party the business it has won, rather than performing the work itself." Mem. in Supp. of U.S.A. Glas's Mot. to Dismiss at 10. Defendants may legally win and keep business that they legitimately earn for themselves through price and quality compe-

tition or through legitimate preferred provider agreements. But Defendants may not win business through agreements with the insurance companies to misinform a potential glass customer about his or her options for glass repair. These types of agreements may be unreasonable restraints of trade under Section 1 because they would operate to the detriment of consumers. Competition would be harmed if consumers were routed to particular glass repair companies based on factors other than competitive pricing or quality in the marketplace. If such agreements to boycott exist, they may fall into the forbidden category under *per se* scrutiny. *See Superior Court Trial Lawyers Ass'n*, 493 U.S. at 433, 110 S.Ct. at 780–81; *Royal Drug Co.*, 737 F.2d at 1436.

### 3. Antitrust Injury

■ Defendants argue that Plaintiffs lack standing to bring this antitrust action because the complaint fails to allege that Plaintiffs suffered "antitrust injury" from Defendants' acts. The Clayton Act authorizes treble-damage suits for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Private plaintiffs must establish standing to recover damages for antitrust violations. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 993 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). Standing is a threshold issue determinable from the allegations of the complaint. *Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 280 (5th Cir.1984). Antitrust injury is an essential element of standing without which a plaintiff cannot recover. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986).

■ Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "In pleading an antitrust claim for damages under section 4 of the Clayton Act, therefore, a plaintiff must allege, either

directly or inferentially, that he has suffered an anticompetitive injury as a result of the defendants' antitrust violation." *Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 939 (5th Cir.1988). The plaintiff must allege that the defendant's antitrust violation was the cause-in-fact of the plaintiff's injury or that "but for" the violation, the injury would not have occurred. *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565, 573 (7th Cir.1994).

■ Plaintiffs sufficiently allege that they have suffered "antitrust injury." Plaintiffs allege that Defendants' conspiracy has reduced competition in the marketplace. Pls.' Second Am.Compl. ¶ 12. Plaintiffs further allege that they have suffered injury in the form of lost profits as a result of Defendants' restraints of trade. *Id.* ¶ 22. As alleged, Plaintiffs' injury is of the "type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. at 697. Antitrust laws were intended to prohibit firms from restraining trade by harming other competitors, which in turn harms consumers by restricting competition, increasing prices, and decreasing output. *Anago, Inc. v. Tecnol Medical Prods. Inc.*, 976 F.2d 248, 249 (5th Cir.1992), *cert. dismissed*, 510 U.S. 985, 114 S.Ct. 491, 126 L.Ed.2d 441 (1993); *see also* PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶¶ 103–104 (1978). Plaintiffs also allege that their lost profits were caused by Defendants' unlawful agreements. *See Great W. Directories v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1387–88 (5th Cir.1995) (holding that loss of profits caused by exclusionary conduct by a competitor is sufficient for antitrust injury), *superseded in part on other grounds*, 74 F.3d 613, *cert. dismissed*, —— U.S. ——, 117 S.Ct. 26, 135 L.Ed.2d 1120 (1996).

In the context of a motion to dismiss for failure to state a claim, the court must determine whether *any* factual theory alleged, if true, would entitle a plaintiff to some legal remedy. *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–102. While Plaintiffs' complaint is short on the details of the alleged boycott, the court is aware that no discovery has

occurred in this case. After discovery in this case, Plaintiffs will have an opportunity to amend their complaint detailing the alleged agreements and any pernicious effect on competition. At this stage in the proceedings, however, Plaintiffs have alleged sufficient facts under Section 1 for conspiracy to boycott the Plaintiffs.

### 4. Section 1 Price Fixing Claim

■ Defendants argue that Plaintiffs do not have the requisite antitrust injury to bring a Section 1 price fixing claim because any conspiracy by Defendants to raise prices would help Plaintiffs rather than injure them. Mem. in Supp. of U.S.A. Glas's Mot. to Dismiss at 5. Plaintiffs respond: "That Defendants have agreed to charge higher prices certainly harms the public; That they have also agreed to exclude Plaintiffs from the market place harms both Plaintiffs and the public." Pls.' Resp. to Defs.' Reply Briefs in Supp. of their Mots. to Dismiss at 4. The antitrust injury doctrine "prevents losses that stem from competition from supporting suits by private plaintiffs." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342, 110 S.Ct. 1884, 1893, 109 L.Ed.2d 333 (1990). In particular, the antitrust injury doctrine does not allow competitors to " 'recover damages for any conspiracy ... to charge higher than competitive prices' " because competitors " 'stand to gain from any conspiracy to raise the market price.' " *Id.* at 337, 110 S.Ct. at 1890 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83, 106 S.Ct. 1348, 1353–54, 89 L.Ed.2d 538 (1986)); *see also Rockbit Indus. v. Baker Hughes, Inc.*, 802 F.Supp. 1544, 1548–49 (S.D.Tex.1991) (holding that a competitor lacked standing even if it was the target of the price fixing conspiracy). Because Plaintiffs stand to gain from any conspiracy to raise prices, they do not have the requisite "antitrust injury" necessary to maintain a Section 1 claim for a conspiracy to fix prices at higher levels.

Even if the court were to infer that Plaintiffs' complaint alleged that Defendants were conspiring to fix prices at lower levels, Plaintiffs again would not suffer the requisite antitrust injury. The Supreme Court has stated: "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Atlantic Richfield Co.*, 495 U.S. at 340, 110 S.Ct. at 1892. Plaintiffs have not made any allegations that Defendants set prices at predatory levels.

### 5. Section 1 Market Division and Allocation Claim

■ As with their price fixing claim, Plaintiffs do not have the requisite antitrust injury to maintain a Section 1 claim for market division and allocation. Division and allocation agreements between competitors minimize competition because each competitor has agreed not to compete in the other's market. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50, 111 S.Ct. 401, 402–403, 112 L.Ed.2d 349 (1990). Plaintiffs allege that Defendants "unlawfully divided and allocated customers in the relevant market and submarkets in the State of Texas." Pls.' Second Am.Compl. ¶ 16. "[Competitors] cannot recover for a conspiracy to impose nonprice restraints [*e.g.*, division and allocation] that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive." *Matsushita Elec. Indus.*, 475 U.S. at 583, 106 S.Ct. at 1354 (emphasis in original). Agreements on price and agreements to divide or allocate markets have the same effect on price, output, and competitors. *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996). If, as alleged, Defendants divided and allocated the markets, such action would benefit Plaintiffs. Plaintiffs would face less competition in markets in which Defendants attempted to reduce competition among themselves through division and allocation.

### B. *Section 2 of the Sherman Act*

### 1. Section 2 Standards for Monopolization, Attempted Monopolization, and Conspiracy to Monopolize

■ Under Section 2, it is illegal to "monopolize, or attempt to monopolize, or

combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. "To state a claim for monopolization, a plaintiff must allege: (i) a relevant product and geographic market; (ii) the possession of monopoly power in such market; and (iii) the willful acquisition or maintenance of that power." *Rockbit Indus.*, 802 F.Supp. at 1550 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *C.E. Serv., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985)). "[T]o state a claim for attempted monopolization, a plaintiff must allege: (i) a relevant product and geographic market; (ii) a specific intent to monopolize that market; (iii) exclusionary or predatory conduct in furtherance of the attempted monopolization; and (iv) a dangerous probability that, absent judicial intervention, the attempt will be successful." *Rockbit Indus.*, 802 F.Supp. at 1552–53 (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir.1984)). To state a claim for conspiracy to monopolize, a plaintiff must allege: (i) the existence of a combination or conspiracy; (ii) an overt act in furtherance of the combination or conspiracy; (iii) substantial amount of interstate commerce effected; and (iv) specific intent to monopolize. *North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1335 (5th Cir.1986) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947)).

In its motion to dismiss, Defendant U.S.A. Glas argues that Plaintiffs have not alleged facts showing that any Defendant possesses or has a dangerous probability of acquiring market power. Mem. in Supp. of U.S.A. Glas's Mot. to Dismiss at 6–7. The elements of monopolization, attempted monopolization, and conspiracy to monopolize vary, but they all share a common requirement that a defendant must have either monopoly power or the dangerous probability of acquiring it. *See Rockbit Indus.*, 802 F.Supp. at 1550 (monopolization); *Id.* at 1553 (attempted monopolization); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F.Supp. 760, 777 (S.D.Miss 1992) (conspiracy to monopolize), *aff'd*, 986 F.2d 1418 (5th Cir.

1993). "Monopoly power is the power to control price or exclude competition." *United States v. American Airlines, Inc.,* 743 F.2d 1114, 1117 (5th Cir.1984), *cert. dismissed*, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985) (internal quotation marks omitted). In an attempted monopolization case, "[a] defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two." *Rockbit Indus.*, 802 F.Supp. at 1553.

To support its theory that Plaintiffs have not sufficiently alleged market power. Defendant U.S.A. Glas argues that Plaintiffs do not allege that each Defendant has at least a fifty-percent market share. Mem. in Supp. of U.S.A. Glas's Mot. to Dismiss at 8 (citing *Rockbit Indus.*, 802 F.Supp. at 1551 ("It is the law in this circuit that a defendant must have a market share of at least fifty percent before he can be guilty of monopolization.")). Defendant U.S.A. Glas's argument would be correct if Plaintiffs were alleging that only one Defendant was violating Section 2. Plaintiffs, however, allege that Defendants have engaged in a joint monopolization.

 The plain language of Section 2 makes it illegal to "monopolize, or attempt to monopolize, *or combine or conspire with any other person or persons,* to monopolize any part of the trade or commerce." 15 U.S.C. § 2 (emphasis added); *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 452–54, 113 S.Ct. 884, 889, 122 L.Ed.2d 247 (1993) ("[Section] 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize."). When two or more persons agree to monopolize, they have committed the offense of joint monopolization provided that they have jointly acquired monopoly power. *See American Airlines,* 743 F.2d at 1118. Joint monopolization claims do not require that the Plaintiffs allege that each Defendant has at least fifty-percent market share. The cases that U.S.A. Glas cites for the proposition that Plaintiffs must allege that each Defendant has at least fifty percent of the market are limited to actions in which it was alleged that a single defendant monop-

olized the market. *See, e.g., Rockbit Indus.,* 802 F.Supp. at 1550–51; *Domed Stadium Hotel,* 732 F.2d at 489–90. Accordingly, Plaintiffs need only allege that Defendants have jointly acquired market power. To allege this market power, however, Plaintiffs must alleged that Defendants have a market share in the aggregate of at least fifty percent. *See Domed Stadium Hotel,* 732 F.2d at 489. While *Domed Stadium Hotel* involved only a single defendant, the fifty-percent market share requirement should apply equally to the joint monopolization context because percentage of market share remains a sound proxy for market power.

### 2. Sufficiency of Facts Alleged for Section 2 Violation

■ Plaintiffs sufficiently allege that Defendants possess market power or a dangerous probability of acquiring market power. Pls.' Second Am.Compl. ¶ 15. Plaintiffs further allege that "the defendant networks control over fifty percent (50%) of the auto glass repair and replacement underwritten by insurance companies in the State of Texas and over 50% of the residential and commercial flat glass repair and replacement underwritten by insurance companies in the State of Texas." *Id.* ¶ 11. Plaintiffs' complaint also contains many factual allegations that Defendants are jointly exercising market power through substantial cooperation on pricing and other business operations. *See, e.g., id.* ¶¶ 9(a)–(r). The court does not address the other elements of monopolization, attempted monopolization, and conspiracy to monopolize because Defendants limited their arguments to the element of monopoly power.

### C. Tortious Interference Claims

Defendants argue (1) that Plaintiffs have not alleged any specific contracts into which they were likely to have entered and (2) that the "interference" of which Plaintiffs complain is merely the privileged business-generation of their competitors. Mem. in Supp. of U.S.A. Glas Mot. to Dismiss at 10–11. Plaintiffs respond: "The complaint here clearly meets FED.R.CIV.P. 8(a)'s requirements for alleging tortious interference with existing and prospective contracts." Pls.' Resp. to Defs.' Mots. to Dismiss at 9–10.

■ "Texas law protects existing and prospective contracts from interference." *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 665 (Tex.1990). The elements for a cause of action for tortious interference with an existing contract are: (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred. *Id.* at 664. The elements of tortious interference with prospective contract or business relationships are:

(1)[A] reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference.

*Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied).

■ "Under the defense of legal justification or excuse, one is privileged to interfere with another's contract (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party." *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 691 (Tex.1989). A party is privileged to cause a third party to terminate business relations with the party's competitor to obtain future benefits by offering the third party better contract terms than its competitors. *Caller–Times Publishing Co. v. Triad Communications, Inc.,* 855 S.W.2d 18, 23 (Tex.App.—Corpus Christi 1993, no writ); *Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 215 (Tex.App.—Houston [14th Dist.] 1991, no writ). " '[T]he privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof.' " *Juliette Fowler Homes,* 793 S.W.2d at 664 n. 7 (quoting *Sterner,* 767 S.W.2d at 690).

■ Plaintiffs sufficiently allege that Defendants tortiously interfered with existing and prospective contracts. In their sixth cause of action, Plaintiffs allege:

Based on the facts stated above and additional evidence to be gathered through discovery and presented at trial, the Defendants, acting individually and in concert, combination, and conspiracy, have tortiously interfered with the Plaintiffs' existing and prospective relationships with customers having need of repair and replacement of auto glass and flat glass underwritten by insurance companies and with the insurance companies who underwrite such insurance coverage in the State of Texas. There was more than a reasonable probability that the Plaintiffs would have entered into a business or contractual relationship with many insureds who were steered to network glass shops. The Defendants acted maliciously by intentionally interfering with and preventing the relationships from occurring, or continuing, for the purpose of harming the Plaintiffs, without privilege or justification. Actual harm and damage to the plaintiffs in the form of loss of business occurred as a result.

Pls.' Second Am.Compl. ¶ 19.

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs are not required to allege that Defendants interfered with specific contracts. *See Colle,* 981 F.2d at 243. Plaintiffs' complaint provides a short and plain statement that gives Defendants notice of what their tortious interference claims are and the general factual grounds upon which they rest. Plaintiffs allege that Defendants' illegal agreements to boycott Plaintiffs have interfered with existing and prospective contracts with customers. While Defendants are privileged to win business from Plaintiffs on the basis of quality or prices, Defendants are not permitted to interfere with Plaintiffs' business on the basis of alleged illegal agreements.

#### D. *Texas Insurance Code, Art. 5.07–1, Claim*

In their seventh cause of action, Plaintiffs allege violations of the Texas Insurance Code, Art. 5.07–1:

Based on the facts stated above and additional evidence to be gathered through discovery and presented at trial, the Defendants, acting individually and in concert, combination, and conspiracy, have limited the beneficiaries of policies issued by various insurance companies from selecting Plaintiffs' glass shops and those similarly situated to repair glass damage to their motor vehicles, homes, and business covered under their policies, in violation of the Texas Insurance Code, Art. 5.07–1.

Pls.' Second Am.Compl. ¶ 20. Defendants argue (1) that the Texas Insurance Code applies only to insurers rather than competing glass providers such as Defendants and (2) that the Texas Insurance Code does not allow for a private right of action. Plaintiffs respond:

Plaintiffs can prove that the Defendants, by their collusive conduct, aiding and abetted insurance companies to limit the beneficiaries of policies from selecting Plaintiffs' glass repair facilities—in violation of Art. 5.07–1(a)—they are entitled to bring such conduct to the jury's attention. Proof of such conduct would not only support Plaintiffs' tortious interference claim, by establishing that Defendants' conduct was neither justified nor privileged, but might also support Plaintiffs' entitlement to punitive damages. Surely, Defendants' [sic] should not be excused from answering charges that they aided and abetted another party to violate the law.

Pls.' Resp. to Defs.' Mots. to Dismiss at 10. While Plaintiffs argue that this allegation would have some evidentiary purpose in this action, the court must focus on whether Plaintiffs can bring this cause of action against Defendants under the Texas Insurance Code.

■ The court determines that Plaintiffs do not have a right of action under Article 5.07–1 of the Texas Insurance Code. This provision regulates the conduct of insurance companies, not glass repair or replacement companies. Article 5.07–1 provides that "an *insurer* may not, directly or indirectly, limit its coverage under a policy covering damage to a motor vehicle ... by limiting the beneficiary of the policy from selecting a person or

shop to repair damage to the motor vehicle covered under the policy." TEX.INS.CODE ANN. art. 5.07–1(a) (Vernon 1981 & Supp. 1996) (emphasis added). Additionally, Plaintiffs do not have standing to bring a cause of action under Article 5.07–1 because the provision does not grant a private right of action.

### IV. CONCLUSION

Therefore, the court ORDERS that Defendants' motions to dismiss are hereby GRANTED with respect to Plaintiffs' third, fifth, and seventh causes of action and DENIED as to the remaining causes of action. Accordingly, the court DISMISSES Plaintiffs' third, fifth, and seventh causes of action.