**KADCO CONTRACT DESIGN CORPORATION, Nicholas Engineering, Inc., Plaintiff,**

v.

**KELLY SERVICES, INC., Defendant.**

No. H–96–3684.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 1, 1998.

Jack N. Price, Austin, Texas, for plaintiff.

William R. Pakalka, Fulbright & Jaworski, Houston, Texas, for defendant.

1. Kadco Contract Design Corporation will be referred to as "Kadco." Nicholas Engineering, Inc., will be referred as "Nicholas." Kadco and Nicholas will be collectively referred as the plaintiffs. And Kelly Services, Inc., will be referred to as Kelly.

2. The plaintiffs have submitted three copies of employee contracts. Kadco's contract will be used as an example, because the other contracts or substantially similar.
 EMPLOYMENT AGREEMENT
 THIS AGREEMENT made January 29, 1996 between FREDRICK B. FORSTH (TEMPORARY EMPLOYEE) and KADCO CONTRACT DESIGN CORPORATION (COMPANY).
 WITNESSETH
 WHEREAS, COMPANY desires to employ TEMPORARY EMPLOYEE for work performed at DOW CHEMICAL USA (CLIENT) now. THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

## MEMORANDUM OPINION AND ORDER

HOYT, District Judge.

## I. INTRODUCTION

Before the Court is the plaintiffs' complaint, the defendant's motion for summary judgment, and the parties respective responses.[1] After a careful and thorough review of the submissions of the parties and the applicable law, the Court grants the defendant's motion for summary judgment and dismisses the plaintiffs' complaint.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The basic facts are undisputed. Kadco and Nicholas, provide temporary employees to perform engineering and other technical services for The Dow Chemical Corporation (hereinafter "Dow"). Although these employees provide technical services for Dow, they are employees of Kadco and Nicholas respectively. The employer/employee relationship enjoyed by the plaintiffs and their respective employees is governed by a written agreement drafted and provided by Kadco and Nicholas.[2]

1. COMPANY hereby employs TEMPORARY EMPLOYEE and TEMPORARY EMPLOYEE hereby accepts such employment subject to the terms and conditions hereinafter set forth.

2. TEMPORARY EMPLOYEE has been employed by the COMPANY to perform work at, and under the direction of CLIENT, said employment to commence on FEBRUARY 5, 1996, at CLIENT's premises at HOUSTON, TEXAS and to terminate when CLIENT informs COMPANY that TEMPORARY EMPLOYEE's services are no longer necessary or as otherwise hereinafter provided (the period of TEMPORARY EMPLOYEE's employment hereunder is called the "TERM").

3. COMPANY will pay TEMPORARY EMPLOYEE at the regular rate of $33.00 per hour effective on the day the TEMPORARY EMPLOYEE reports for work at CLIENT; TEMPORARY EMPLOYEE understands that he is employed on a per hour, as distinguished from per week, per month, etc., basis. If TEMPORARY EM-

PLOYEE is eligible for overtime pay, TEMPORARY EMPLOYEE will be paid $49.50 per hour. TEMPORARY EMPLOYEE agrees that time card records of COMPANY or CLIENT shall be conclusive as to the time worked by TEMPORARY EMPLOYEE. No payment will be made to EMPLOYEE unless he has submitted to COMPANY a time card with hours worked, filled out properly, and SIGNED by CLIENT. IF TEMPORARY EMPLOYEE fails to work on any day or part thereof, for any reason whatsoever, he shall not be entitled to any compensation for time not worked.

4. TEMPORARY EMPLOYEE, upon meeting the hereinafter referred to requirements, SHALL be entitled to forty (40) hours, average regular rate pay, as vacation. TEMPORARY EMPLOYEE, if eligible for such vacation pay, will be entitled, only after he has been continuously employed by COMPANY for no less than one (1) year continuous service.

5. TEMPORARY EMPLOYEE, if eligible, during such period of eligibility will be paid Per Diem (living expense) as herein provided. A Per Diem Allowance of N/A per N/A will be as per KADCO'S directions and qualifications. In order to be eligible for the Per Diem, TEMPORARY EMPLOYEE must maintain a bona fide permanent residence more than 50 miles from the facility of the CLIENT at which he is working and must maintain temporary living quarters near said facility. TEMPORARY EMPLOYEE agrees to notify COMPANY immediately, in writing, if the TEMPORARY makes any change in his permanent or temporary address. TEMPORARY EMPLOYEE understands that he will not be eligible for the Per Diem during periods of TEMPORARY EMPLOYEE requested vacation, other TEMPORARY EMPLOYEE requested time away from work at CLIENT, or plant shutdown. Per Diem to be based on the first forty (40) hours worked each week. Per Diem allowance shall not be paid on overtime hours.

6. TEMPORARY EMPLOYEE, if eligible, will be allowed travel costs of N/A after N/A subject to the provisions herein set forth. If TEMPORARY EMPLOYEE voluntarily terminates his employment within six (6) months after reporting to work at CLIENT or TEMPORARY EMPLOYEE's employment is terminated as result of determination by CLIENT that TEMPORARY EMPLOYEE is unable to satisfactorily perform assigned tasks or is terminated for cause the above reporting travel costs will be deducted from wages owing TEMPORARY EMPLOYEE.

7. TEMPORARY EMPLOYEE shall not accept employment directly or indirectly from CLIENT for a period of six (6) months following the TERM, without written consent of COMPANY. TEMPORARY EMPLOYEE shall be bound by any applicable rules, regulation or policies established by CLIENT. However, should EMPLOYEE accept employment within this six (6) month period, EMPLOYEE will be liable to pay COMPANY a fee of exactly ten percent (10%) of EMPLOYEE's yearly salary payable to KADCO on demand.

8. All information pertaining to COMPANY or any of COMPANY's CLIENTS, inventions, designs, tools, equipment, unpublished written materials, plans, processes, costs, methods, systems, improvements, or other private or confidential matters which are obtained by TEMPORARY EMPLOYEE in the performance of his work hereunder and which are not publicly disclosed by COMPANY or its CLIENTS shall be considered as confidential and proprietary to COMPANY or to the CLIENTS which supplies or provides such information. TEMPORARY EMPLOYEE shall not, at any time during or after the TERM, disclose any such information nor the nature of the service which he renders of CLIENT, except to authorized representative of COMPANY or CLIENT. This paragraph shall be for the benefit of COMPANY and the CLIENT and either or both shall have all rights and remedies to enforce the restrictions of this paragraph. TEMPORARY EMPLOYEE acknowledges that he is completely familiar with the provisions of the Standard Security Practices and Procedures Manual, unless he reports to COMPANY, in writing, a lack of such familiarity and knowledge, in which event COMPANY will deliver a copy of such manual to EMPLOYEE, who will become familiar with same immediately upon reporting to CLIENT.

9. TEMPORARY EMPLOYEE agrees that all equipment and/or specialty safety clothing provided by CLIENT or COMPANY remains the property of CLIENT or COMPANY and is to be returned upon termination of employment in good condition, normal wear and tear accepted. Should Employee fail to return any or all, the employee agrees to reimburse the provider of such at actual cost and agrees COMPANY may deduct this cost from final pay check if due.

10. TEMPORARY EMPLOYEE shall be bound by an[y] applicable rules, regulations or policies established by CLIENT.

11. This agreement shall be construed under the laws of the State of Texas, U.S.A., and any action brought as a result of the breach of this contract shall be brought in the State of Texas, U.S.A., or in such other

On July 22, 1996, Dow and Kelly, another "Temp" service, entered into an agreement by virtue of which Kelly was to become Dow's exclusive provider of contract labor. On that day, Dow circulated an internal memorandum, which stated in pertinent part:

> Dow has announced that Kelly Services will become Dow's sole supplier of selected temporary staffing positions.... The consolidation into a single supplier will result in cost savings to Dow of approximately $3 million.... Virtually all of the contract employees affected by this change will be offered the opportunity to work for Kelly Services. They can continue their current assignments at their current pay. Kelly provides benefits that are competitive with, and in some cases better than, those provided by the local contractor firms. Each contract employee can choose to continue their Dow assignment by working at Kelly, or stay with their current employer and move to another assignment not at Dow.

Also on that day, Kadco and Nicholas received letters from Dow, the letters announced that upon the expiration of their respective contracts, Kadco's and Nicholas' services would be no longer needed. The next day Kadco and Nicholas responded by letter, demanding that Dow cease its actions and accusing Dow of tortious interference with the business relationship between the plaintiffs and their respective employees. In an apparent retreat from their prior position, Dow replied in writing explaining that Dow's use of Kelly as a primary supplier of contract labor would apply only to future projects and that Dow would continue its relationship with Kadco

and Nicholas. And in fact, all parties admit that Dow has since continued to maintain a limited relationship with the plaintiffs.

On September 30, 1996, the plaintiffs filed their original petition in the 80th District Court of Harris County. Kelly and Dow filed their Notice of Removal pursuant to 28 U.S.C. §§ 1332(a) and 1441(a), claiming that diversity jurisdiction exist in this case because there was complete diversity of citizenship between the plaintiffs and the defendants and the amount in controversy exceeds $50,000, exclusive if interest and cost. Based on the applicable law and evidence before it, the Court determined that diversity jurisdiction was proper.[3]

## III. THE PARTIES CONTENTIONS

Kadco and Nicholas assert two claims in their second amended complaint. They advance allegations of tortious interference with, and conspiracy to tortiously interfere with their contractual relationships with their employees. Kadco and Nicholas claim that the internal memorandum circulated by Dow was part of a planned and concerted effort by Dow and Kelly to obtain their employees. Kadco and Nicholas argue further, that the purpose of the memorandum was to persuade and induce Kadco and Nicholas employees to breach their contracts and sever their employment status.

In its summary judgment motion, Kelly argues that: (1) the plaintiff's have no contracts with their employees that could be subject to interference; (2) the covenant not to compete included in the em-

---

proper jurisdiction as COMPANY may decide.

12. This agreement contains the entire agreement between the parties and there are no representations or agreements between the parties except as herein provided. If any provision of this agreement shall be held invalid or unenforceable according to law, such invalidity or unenforceability shall affect any other provision hereof.

Temporary Employee Signature—Fredrick B. Forsyth /s/1/29/96
Kadco Contract Design Corporation /s/

**3.** A third plaintiff, Resource Management International, Inc., voluntarily dismissed its claims against Kelly and Dow. Dow, Kadco and Nicholas have since entered an out of court agreement which resulted in Kadco and Nicholas dismissing their claim against Dow.

ployment contract is unenforceable and therefore, cannot form the basis of a tortious interference claim; (3) as a competitor of Kadco and Nicholas, Kelly was privileged to hire any of their at will employees; and (4) because the employment contract contained a provision allowing employees to accept employment with competitors provided they paid a portion of their annual salary, accepting employment with Kelly does not constitute a breach of the contract.

## IV. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

Once the moving party carries its burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. If an adverse party completely fails to make an offer of proof concerning an essential element of that party's case, on which that party will bear the burden of proof, then all other facts are necessarily rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322–323, 106 S.Ct. 2548.

Hence, the granting of summary judgment involves a three-tier analysis: First, whether a genuine issue actually exists, so as to necessitate a trial. An issue is genuine, "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Second, whether that genuine issue is regarding material facts. The substantive law of the case identifies the material facts, in that, facts that potentially affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. Third, assuming no genuine issue exists as to the material facts, whether the moving party should prevail solely as a matter of law.

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## I. DISCUSSION

Kadco and Nicholas essentially advance two alternative theories for tortious interference. First, they argue that Kelly induced and encouraged their employees to end their employment with Kadco and Nicholas. And second, Kadco and Nicholas argue that Kelly induced and encouraged their employees to violate the covenant not to compete contained in the agreement by accepting employment from Dow indirectly (by working for Kelly). The Court will address both of these claims in turn.

 Kadco and Nicholas argue first that their employee agreements are not terminable at will because the express lan-

guage of the agreement suggests otherwise. The Court disagrees with the plaintiffs' contract interpretation. Texas is an employment at-will state. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex.1991). Absent a specific contract term to the contrary, this doctrine allows an employee to quit or be fired without liability on the part of the employer or employee, with or without cause. *Id.; Molder v. Southwestern Bell Tel. Co.*, 665 S.W.2d 175, 177 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). The mere fact that an employment contract is in writing, is insufficient to rebut the presumption of employment at-will. An employment contract must directly limit in a "meaningful and special way" the employer's right to terminate the employee without cause. *Lee–Wright, Inc. v. Hall*, 840 S.W.2d 572, 577 (Tex.App.—Houston [1st Dist.] 1992, no writ).

Paragraph two of the Kadco Agreement provides, "said employment to . . . terminate when CLIENT [Dow] Informs COMPANY that TEMPORARY EMPLOYEE's services are no longer necessary or as otherwise hereinafter provided. . . ." Additionally, paragraph three provides, "TEMPORARY EMPLOYEE understands that he is employed on a per hour, as distinguished from per week, per month, etc., basis." The Nicholas contract contains virtually identical language, but also provides, "This agreement shall be terminable at will by COMPANY, but only upon thirty (30) days written notice to the COMPANY by EMPLOYEE. . . ."

■ The Nicholas agreement speaks for itself, it is an at-will agreement, and Nich-

olas, as the drafter of the agreement, will not be heard to state otherwise. Also, the Court finds the requirement that the employee provide Nicholas 30 days written notice to be void for lack of consideration.

■ Regarding the Kadco agreement, it expressly states that Kadco is free to terminate the employee's employment at the client's request or as otherwise provided by the company. The agreement does not require Dow to state a basis for its termination request. Nor does the agreement expressly limit Kadco's ability to terminate the employee without cause. More telling, however, is the express disclaimer set forth in the agreement, which clarifies the employee's salary arrangement as per hour, as opposed to a weekly or monthly salary.[4] This language makes clear the drafter's intent to not have this employment relationship construed as anything more than at will. Accordingly, the Court finds that it was the intent of the parties that the employee's employment status be at will. And in any event, the plaintiff has failed to adduce sufficient evidence to rebut the employment at will presumption. There is nothing in the agreement that can be read to limit either party from terminating the employment relationship without liability.

■ With regard to contractual interference, as it relates to the employer/employee relationship, Kadco and Nicholas's claims are without merit. A third party's efforts to induce another to exercise his rights to dissolve an at-will contract does not constitute tortious interference with a contract, under Texas law.[5] *C.E. Services,*

---

4. Texas follows the general rule practiced in England, which dictates that a hiring at a stated sum per week, month, or year, is a definite employment for the period named and may not be arbitrarily concluded. Any stated sum less than this (i.e., daily or hourly) is for no definite period at all, and is therefore terminal at-will.

5. Under Texas law, the following elements must be established to constitute a cause of action for tortious interference with contrac-

tual relations: (1) there was a contract subject to interference; (2) the act of interference was willful and intentional; (3) such intentional act was a proximate cause of plaintiff's damage; and (4) actual damage or loss occured. *Juliette Fowler Homes v. Welch Associates, Inc.*, 793 S.W.2d 660, 664 (Tex.1990). The first element requires the existence of a contract subject to interference. *Steinmetz & Assoc., Inc. v. Crow*, 700 S.W.2d 276, 277 n. 1 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

*Inc., v. Control Data Corporation,* 759 F.2d 1241, 1248 (5th Cir.1985) (citing *Claus v. Gyorkey,* 674 F.2d 427, 435 (5th Cir.1982)); *Kingsbery v. Phillips Petroleum Co.,* 315 S.W.2d 561, 576 (Tex.Civ.App. 1958); see also *Times Herald Printing v. A.H. Belo Corp.,* 820 S.W.2d 206, 215 (Tex. App.—Houston [14th Dist.] 1991, no writ) (citing Restatement (Second) of Torts § 768(2) & comment i (1977)).[6] As the plaintiffs' competitor, Kelly is privileged in causing at-will employees to terminate their business relationship with the plaintiffs. *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.,* 940 F.Supp. 1026, 1038 (E.D.Texas 1996) (citing *Caller–Times Publishing Co. v. Triad Communications, Inc.,* 855 S.W.2d 18, 23 (Tex.App.—Houston [14th Dist.] 1991, no writ)).

Next, we turn to Kadco and Nicholas' second argument. The plaintiffs argue that Kelly induced and encouraged Kadco and Nicholas employees to violate the covenant not to compete contained in the agreement. Section 15.50 of the Texas Business and Commerce Code, sets forth the criteria for determining the enforceability of Covenants not to compete and provides in relevant part:

> Notwithstanding Section 15.05 [which generally declares restraints on competition unlawful] of this code, a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex.Bus. & Com.Code § 15.50 (Vernon Supp.1994).

■ The enforceability of a covenant not to compete, including the question of whether a covenant not to compete is a reasonable restraint of trade, is a question of law for the court. *Light v. Centel Cellular Company of Texas,* 883 S.W.2d 642, 644 (Tex.1994).

The Court must first determine whether the covenant not to compete in this case is ancillary to or a part of an otherwise enforceable agreement at the time the agreement was made. *Id.* at 644. The Kadco and Nicholas employees are employees-at-will, and therefore, they and their employers cannot have an otherwise enforceable agreement between themselves pertaining to the duration of their employment. As explained by the court in *Light:*

> At-will employees may contract with their employers on any matter except those which would limit the ability of either employer or employee to terminate the employment at will. Consideration for a promise, by either the employee or the employer in an at-will employment, cannot be dependent on a period of continued employment. Such a promise would be illusory because it fails to bind the promisor who always retains the option of discontinuing employment in lieu of performance. (Citations omitted.) When illusory promises

---

**6.** "Competition as Proper or Improper Interference"

> 1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if a) the relation concerns a matter involved in the competition between the actor and the other and b) the actor does not employ wrongful means and c) his action does not create or continue an unlawful restraint on trade and d) his purpose is at least in part to advance his interest in competing with the other.
>
> 2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an improper interference if the contract is not terminable at will.

Restatement (Second) of Torts § 768. The "wrongful means" of § 768(1)(b) include physical violence, fraud, civil suits, and criminal prosecutions, but do not include persuasion or limited economic pressure. Restatement (Second) of Torts § 768 comment e.

**496**

are all that support a purported bilateral contract, there is no contract. In short, we hold that "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory.

*Light,* 883 S.W.2d at 644–45.

 In the agreement between Kadco and Nicholas and their respective employees, there is only one promise that is not illusory and thus capable of serving as consideration for any agreement: the employees agreement that "all equipment and/or specialty safety clothing provided by [Dow] or COMPANY remains the property of [Dow] or COMPANY and is to be returned upon termination of employment. . . . [7] Even if the employees had resigned or been fired after this agreement was executed, they would still be required to return their uniforms. Thus, an otherwise enforceable agreement for the employees to return their uniform existed at the time the agreement was consummated between the employees and the plaintiffs.

The second question to be answered by the Court is whether the covenant not to compete is ancillary to or part of the otherwise enforceable agreement. The otherwise enforceable agreement must give rise to the interest worthy of protection by the covenant not to compete. *Light,* 883 S.W.2d at 646. Under Texas law, in order for a covenant not to compete to be ancillary to an otherwise enforceable agreement between employer and employee:

> (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and
>
> (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement.

*Id.* at 646. Unless both of these elements are met, the covenant cannot be ancillary to or part of an otherwise enforceable agreement, and therefore constitutes a restraint of trade is and unenforceable. *Id.*

In the instant case, the consideration given by Kadco and Nicholas (uniforms) does not give rise to the their interest in restraining the employees from competing. Nor is the covenant designed to enforce the employee's return promise in the otherwise enforceable agreement. Thus the Court concludes that the covenant not to compete is void and unenforceable. Because Kelly, as a competitor to Kadco and Nicholas, was privileged to cause the termination of an at-will agreement and because the agreement's covenant constitutes an unreasonable restraint of trade, the Court holds that the plaintiffs' claim of conspiracy to commit tortious interference likewise fails. See *Trammel Crow Company v. Harkinson,* 944 S.W.2d 631, 635 (Tex.1997).

## VI. CONCLUSION

Accordingly, the Court concludes that Kelly is entitled summary judgment as a matter of law, on all of its claims against and defenses to Kadco and Nicholas' suit. It is so Ordered.

This is a Final Judgment.

---

**7.** Every other promise in the agreement between the employees and the plaintiffs (i.e. promise to pay salary and overtime in paragraph 3, promise to provide forty hours compensation as vacation in paragraph 4, promise to provide Per Diem allowance in paragraph 5) is illusory because each is dependent upon some interval of continued at-will employment.